PERCY L. RINEHART *et al. v.* WOODFORD FLYING SERVICE, INC., *and* CARL B. WOODFORD

(No. 9025)

Submitted April 30, 1940. Decided June 11, 1940.

*E. L. Maxwell,* for plaintiffs in error.
*Cuppett & Cuppett,* for defendant in error.

HATCHER, JUDGE:

Plaintiffs recovered a judgment for damages received by their airplane in a collision with that of defendants.

A commercial meet was in progress on July 4, 1938, at the Elkins Municipal Airport, the home port of plain-

tiffs' plane. It, after an absence of several days from the port, returned in the daytime, and while landing, collided with defendants' plane, a participant in the meet, which was also landing at the same moment. The questions here relate to the rules and regulations applicable to the landings.

Code, 29-2A-2, gave the West Virginia Board of Aeronautics authority over all phases of aerial activities, with power to make such rules and regulations as the board deemed advisable for the public safety, the board being required, however, to "adopt and enforce the provisions of the Federal Air Commerce Act, now in force or as hereafter amended, so as to make applicable as far as possible the provisions of that act to the State of West Virginia." Section 7 provided that non-compliance with any rule or regulation of the board should be a misdemeanor. The public safety as provided for by the federal act established a definite legislative standard for the guidance of the board and thus legalized its rules and regulations made in furtherance of that standard. "The legislature may not vest executive officers or bodies with uncontrolled discretion in making rules and regulations, and must establish sufficient standards for their guidance. However, having established a sufficiently definite policy, standard, or rule, the legislature may authorize an administrative officer or body to make rules, regulations, or orders relating to the administration or enforcement of the law, and give to such rules and regulations binding force and effect of law." 16 C. J. S., Constitutional Law, section 138, pp. 352-3. Accord: *U. S.* v. *Grimand,* 220 U. S. 506, 31 S. Ct. 480, 55 L. Ed. 563.

In conformity with the statute, the board passed a rule that no person should land an aircraft on any airport in West Virginia, except according to the prescriptions of the Air Commerce Regulations established by the Secretary of Commerce. Under the express legislative mandate to the board, this rule is a law. The federal act in effect at the time of this collision provided that the Secretary of Commerce should "establish air traffic rules for the navi-

gation * * * of aircraft." Federal Code Ann., Title 49, Chapter 6, Section 173 (e). The regulation of the Secretary applicable here was this: "60.3302 (c) Aircraft approaching for a landing shall circle the airport or other landing area sufficiently to observe other traffic, unless the pilot receives other instructions from the airport traffic control operator. Such circles shall be made to the left unless the pilot receives other instructions from the airport traffic control operator, or unless local traffic rules approved by the Secretary provide otherwise." The board supplemented the above regulation with this one: "All aircraft approaching the airport shall fall in the line of traffic and skirt the field until a point has been reached where a landing can be made (as nearly as surface conditions will permit) into the wind (directly into the wind in case of all-way fields) and if practicable with a straight glide beginning at least 1,000 feet from the leeward edge of the landing field as practicable. Pilots by day shall circle the field not less than 180 degrees before landing."

One of plaintiffs was piloting their plane at the time of the collision and they rely on his uncontradicted testimony as showing compliance with these regulations. He described his approach and landing as follows:

> "We approached the Elkins Municipal Airport from the direction of the City of Elkins and came in over the west end of the airport, * * * and encircled the airport counter-clockwise, keeping the airport so we could look to our left and have a plain view of the airport. As we came in over the lower end of the field we observed one cabin plane, a Stinson I thought it was, had taken off and was in the air to our right, and another one was just taking off. * * * A Stinson plane. And we observed another plane, a Kinner-Bird (defendants') setting up in front of the hangar on the apron. As we came on around we observed the field, having a very fine view of it, saw all of it. We saw these two Stinson planes taking off the northwest runway there, and as we circled on around to make our observations and to effect an approach we saw the Kinner-Bird plane take off

> down the runway in the same direction as the previous planes, the Stinsons, had. We could see then that the field was clear and no other airplanes were on the field. That is what we wanted to observe, and see if they were taking off according to regulations. We were taught according to regulations of the Bureau of Air Commerce that we should land as planes were taking off, and we had circled the field 180 degrees or better. When we saw this last plane take off we were sure we were all right to make a landing then, because we knew they would (should) come back of us and follow in serially, and we made our approach and come in on the east-west runway * * *. Our plane landed, our wheels touched the ground I would say about thirty or forty feet on the east-west runway * * * and rolled down a couple of hundred feet when the collision occurred, * * * it was all so quick—from our observation the field was perfectly clear and the traffic, as we under stood the regulations, would move in back of us. We couldn't see any other planes around and we knew they had taken off the field—the first thing that I knew, before our plane had stopped rolling why something hit us, and it appeared to hit us head-on but evidently didn't as it caught our left wing."

Plaintiffs further showed, without contradiction, that their plane landed "the way the wind sock showed us to land" and the landing glide was started "a quarter to half mile beyond the airport."

Defendants' plane landed facing plaintiffs'. Defendants would justify this landing because of a local traffic rule agreed upon by the participants in the meet and promulgated by the manager of the airport, himself a participant. By that rule, a plane landed in the opposite direction from that which it had taken off. None of the plaintiffs had notice of this rule; it was not approved by the Secretary of Commerce; it cannot be justified as against strangers. Furthermore, defendants' pilot admitted that when an airmeet was in progress a regulation required that the airport be marked open or closed, in manner easily visible

from the air, and that commercial operations be suspended five out of every thirty minutes for the safety and convenience of planes not participating in the meet; and that these requirements were not met and he knew at the time they were not.

Defendants take the position that plaintiffs' pilot, knowing the meet was in progress, should have circled the field until he saw how the planes in the meet were landing. We find no such duty imposed on him by any regulation. He did circle the field (more than 180°) until he had observed the three planes in the meet take off, i. e. *observed the traffic*. They did so in the usual manner. The field was clear. He fell *in the line of traffic*. He had been taught by the very manager of this port, that, according to regulations, he could then land and that the other planes should move in back of him and follow his landing, serially. Having received no instructions from the manager to the contrary, he seems to have met in every particular all requirements as to his landing. The collision is chargeable to breaches of rules and regulations, knowingly participated in by defendants' pilot.

Defendants, for the purpose of having the several regulations construed, offered the testimony of an official in the Department of Commerce and of an official in the West Virginia department of aeronautics. This testimony was excluded and defendants allege error. The regulations are not ambiguous. Their construction was for the court, not those officials. *Hudson* v. *Ry. Co.*, 106 W. Va. 437, 441, 146 S. E. 525.

Defendants complain of instructions given and instructions refused. The rulings of the court thereon were in accord with the views herein expressed.

The judgment is affirmed.

*Affirmed.*